UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MULTIFAMILY CAPTIVE GROUP,
LLC, a Maryland Corporation;
and SAMANTHA GUMENICK, an
individual,

         Plaintiffs,

    v.

ASSURANCE RISK MANAGERS, INC.,
a Colorado Corporation; LISA
ISOM, an individual;
CALIFORNIA APARTMENT
ASSOCIATION, a California
Association,

         Defendants.
_____/

NO. CIV. 08-cv-00547 FCD DAD

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on cross motions for summary

judgment, pursuant to Federal Rule of Civil Procedure 56.

Defendant California Apartment Association ("CAA" or "defendant")

moves for summary judgment on plaintiffs' breach of contract,

fraud, conspiracy, and detrimental reliance claims.  Plaintiffs

Multifamily Captive Group ("MCG") and Samantha Gumenick

1

(collectively "plaintiffs") move for summary judgment on their unjust enrichment/ restitution claim, asserting that there is no genuine issue of material fact as to whether CAA received a benefit from plaintiffs' efforts, this benefit was received at the expense of plaintiffs, and it is unjust for defendants to retain this benefit. For the reasons set forth below, defendant's motion is GRANTED in part and DENIED in part, and plaintiffs' motion is DENIED.

## BACKGROUND[1]

### A. The Parties

Plaintiff MCG is a Maryland corporation offering insurance programs tailored to the needs of multifamily and real estate property owners and managers. (First Amended Complaint ("FAC"), filed May 15, 2008, at ¶¶ 1, 10.) According to the Complaint, MCG "brings together experts in residential and commercial real estate with authorities in insurance program management." (Id. ¶ 10.) Plaintiff Gumenick, the sole operator and manager of MCG, has been licensed by the California Department of Insurance to sell insurance in California since August 2006. (Id. ¶¶ 2, 54.) MCG has never been issued a license by the California Department of Insurance. (UF ¶ 56.)

### B. Pre-Contractual Dealings

In early 2003, defendant CAA, an association of owners, managers, and vendors of rental property located throughout California, began considering providing property and general

---

[1] Unless otherwise noted, the facts herein are undisputed. (See Def.'s Reply Statement of Undisputed Facts in Support of Mot. for Summ. J. ("UF"), filed Apr. 9, 2009.)

liability insurance to its members. (Decl. of Vicki Walter in
Supp. of Mot. for Summ. J. ("Walter Decl."), filed Feb. 3, 2009,
at ¶ 3; UF ¶ 1.) Ralph Eidem, CEO of Commercial Associates,
introduced Gumenick to CAA. (Id. ¶¶ 2-3.) Initially, CAA,
through Vicki Walter ("Walter"), CAA's Senior Vice President of
Operations, and Gumenick discussed the possibility of
establishing a captive insurance program. (UF ¶ 12; Walter Decl.
¶ 5.) These discussions continued through November 2004 (UF ¶
13), at which point CAA began considering a sponsored insurance
program for property and general liability insurance instead of a
captive insurance program. (Id. ¶ 14.) Gumenick participated in
discussions with CAA regarding this sponsored program from
November 2004 to August 2005. (Id. ¶ 15.) Around August 2005,
CAA began considering different options for a sponsored property
and general liability program. (Id. ¶ 16.) Gumenick remained
part of these discussions as well. (Walter Decl. ¶ 7.)

As of December 2005, CAA had not adopted a program and began
contemplating selecting a broker or agency that would work with
CAA to provide a property and general liability insurance program
for CAA members. (UF ¶ 18.) CAA continued discussions with
Gumenick regarding this latest option through April 2006 (Walter
Decl. ¶ 8) and, according to plaintiffs, Gumenick worked during
this period on an insurance program conforming to the new
criteria. (Decl. of Samantha Gumenick in Opp'n to CAA's MSJ and
in Supp. of Pls.' Mot. for Partial Summ. J. ("Gumenick Decl."),
filed Apr. 2, 2009, at ¶ 3.) Gumenick's work during this time
included a "detailed evaluation" of a Property and Liability
Program, including an analysis of different insurance providers.

3

(Id.; Ex. 112 to Dep. of Vicki Walter ("Walter Dep."), Mar. 10, 2009.)  According to CAA, it decided to place this project on hold in April 2006 (Walter Decl. ¶ 8), and Gumenick admitted during her deposition that the captive property and general liability programs she discussed with CAA "never came to fruition."  (Dep. of Samantha Gumenick ("Gumenick Dep."), Dec. 12, 2008, at 46:10-15; see also id. at 52:2-6 (Gumenick's testimony stating that she didn't know whether the sponsored program was ever implemented).)

According to CAA, MCG began working with CAA on finding a replacement program for workers' compensation insurance in August 2006.  (Walter Decl. ¶ 9.)  However, plaintiffs contend that these discussions began "months earlier," (UF ¶ 27), and that Gumenick continued to work on the property and liability programs "through the first part of 2007" in addition to the workers' compensation program, (Gumenick Decl. ¶¶ 3, 7).

### C.    The Alleged Oral Contract

According to plaintiffs, "[o]n or about October 1, 2006, Plaintiffs and CAA, by its Senior Vice President of Operations, Vicki Walter, entered into an oral agreement whereby Plaintiffs would serve as the exclusive broker for the creation, sale and marketing of the Insurance Programs." (Pls.' Opp'n to Def.'s MSJ ("Opp'n"), filed Apr. 2, 2009, at 4; Ex. 101 to Decl. of Tom Bannon in Supp. of Def.'s MSJ ("Bannon Decl."), filed Feb. 3, 2009.)  Gumenick testified to the following in her deposition:

> In the property and liability, when they told me that I was chosen as the one, or however they said it, in my paraphrasing they had selected me from several people, and I was the only one they had selected and that I was then going to act on their behalf as the sole broker,

4

exclusive broker, for their property and liability.

> For workers' comp, I specifically went and asked them-
> -because they had stated to me several time I was the
> exclusive broker.  I had asked them again to confirm
> that, and they did.

(Gumenick Dep., at 176:25-177:10.)

The parties agree that there were no discussions regarding compensation and that plaintiffs would not be entitled to any compensation for any programs not implemented.  (UF ¶¶ 24-25.)

**D.  Post-Contractual Dealings**

Plaintiffs contend that they "continuously worked on CAA's behalf to establish the Insurance Programs" between October 2006 and May 2007.  (Opp'n at 6.)  On February 8, 2007, Gumenick met with and presented a proposal to Walter and Tom Bannon, CEO of CAA.  (UF ¶ 28; <u>see also</u> Ex. B to Walter Decl. (agenda for the meeting between Gumenick, Walter, and Bannon).)  According to CAA, the primary purpose of the meeting "was to discuss the workers' compensation insurance marketplace and a potential workers' compensation insurance program for CAA members." (Walter Decl. ¶ 10.)  It was during the meeting that Bannon first told Gumenick that CAA planned to establish its own insurance brokerage agency for the purpose of providing insurance products to its members.  (UF ¶ 30.)

Following this meeting, on March 7, 2007, Gumenick prepared an "Insurance Enrollment Marketing Plan." (Ex. 115 to Walter Dep.)  Notes taken by Walter on April 23, 2007 indicate that Gumenick was working with several insurance carriers, including Cypress Arrowhead and Zenith, among others, in formulating her proposals.  (Ex. 101 to Dep. of Thomas Bannon ("Bannon Dep."),

Mar. 9, 2009.)  On approximately May 10, 2007, Gumenick made another presentation, along with Risk Partners and Zenith Insurance.  (Walter Decl. ¶ 11; <u>see also</u> Ex. 13 to Gumenick Decl. (email thanking Gumenick for Gumenick's "team's" presentation).)

### E.  Isom's Involvement

Co-defendant Lisa Isom, insurance broker and president of co-defendant Assurance Risk Managers ("ARM"), first became involved with CAA in April 2007.  (Ex. 101 to Bannon Dep.) Walter's notes from April 23, 2007 indicate that Walter had a conversation with Isom and that Walter planned to initiate conversations between Gumenick and Isom.  (<u>Id.</u>)  On April 26 2007, Isom sent the following email to Gumenick, to which Walter was copied.

> I apologize for not calling you early today, however, was just getting ready to call you and actually had a telephone call with Vicki [Walter].  We have had several very positive conversations over the past few days and I would like to discuss all possibilities that you are working on, as well as, some ideas we have been working on as well.
>
> As I explained yesterday late afternoon, I would like to get up-to-date with you and what you have been workings [sic] on and certainly do not want to disturb those ideas or plans, however, I would like to continue my efforts to provide this an as option to the Association [CAA].  It is exciting and I want you to feel assured that my intention is to not leave you out of this option.
>
> When you have some time, please give me a call and we can discuss in more detail.  If you would feel more comfortable in calling me with Vicki on the call, please do so.
>
> Thanks
>
> Lisa Isom
> Assurance Risk Managers

(Ex. 116 to Walter Dep.)

Soon after becoming involved, in May 2007, Isom began contacting brokers with whom Gumenick had been working. (See Gumenick Decl. ¶ 10 ("Around this same time period [May 2007], I [Gumenick] was informed by ACE that Ms. Isom had contacted them."); Ex. B to Gumenick Decl. (May 18, 2007 email from Republic Indemnity to Gumenick informing Gumenick that CAA had sent Republic a letter on May 15, 2007 advising her that CAA had "authorized another producer to work with selected markets" and that Republic would therefore be "unable to continue . . . discussions with" Gumenick's firm); Ex. 203 to Dep. of Lisa Isom ("Isom Dep."), Mar. 15, 2009 (May 18, 2007 email, to which Isom was copied, instructing an NIA official not share information with the "East Coast Broker").)

CAA ultimately selected the proposal submitted by Isom on behalf of ARM, a Colorado Corporation owned and operated by defendant Isom. (UF ¶ 37.) On May 30, 2007, Isom, on behalf of ARM, CAA, and NIA, signed an agreement whereby ARM would sell and service CAA's workers' compensation and other property and casualty insurance to CAA members. (Ex. 105 to Bannon Dep.) CAA advised Gumenick of its decision to select another proposal on May 31, 2007. (UF ¶ 39.)

**STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the rule is to dispose of

7

factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325, (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. See Celotex, 477 U.S. at 323-24. If the moving party does not bear the burden of proof at trial, he or she may discharge this burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." Id. at 325. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." Id. at 250. In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. See T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits

and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

**A.  Breach of Contract**

To overcome summary judgment for a breach of contract claim under California law, plaintiffs must set forth competent evidence showing "(1) the existence of a contract; (2) plaintiff[s]' performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damage to plaintiff[s]." EPIS, Inc. v. Fidelity & Guar. Life Ins. Co., 156 F. Supp. 2d 1116, 1124 (N.D. Cal. 2001) (citing Reichert v. Gen. Ins. Co., 68 Cal. 2d 822, 830, (1968)).  Defendant contends that: (1) there is insufficient evidence of a contract; (2) even if a contract did exist, MCG was the only party to the contract and cannot recover commissions; and (3) the terms of any alleged contract were too indefinite and uncertain to be legally binding.  (Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("MSJ"), filed Feb. 3, 2009, at 8.)

**1.  The Existence of a Contract**

Defendant CAA contends that there is insufficient evidence demonstrating the existence of an oral contract between plaintiff Gumenick and CAA, and, therefore, CAA was under no obligation to continue working solely with and through Gumenick in placing its insurance programs.

"A contract between two parties is created by a proposal or offer by one of the parties and an acceptance thereof by the

9

other." <u>Tuso v. Green</u>, 194 Cal. 574, 580-81 (1924). In the context of an insurance broker's right to commissions, "[t]he asking for proposals is a mere call for an offer." <u>Hanley v. March & McLennan-J.B. F. Davis & Son</u>, 46 Cal. App. 2d 787, 794 (1941). Thus, an insurance broker's proposals, standing alone, are mere offers that the prospective client is under no obligation to accept. <u>Id.</u>

CAA asserts that it merely *invited* offers, in the form of proposals, from plaintiff, and that it had every right to reject plaintiff's proposals. Without the existence of a contract stating otherwise, it could choose, i.e., "accept," any other broker's proposal. Gumenick, on the other hand, contends that on October 1, 2006, she and CAA entered into an oral contract under which plaintiff would serve as the exclusive brokers to develop CAA's workers' compensation and property and liability insurance programs (collectively, "the insurance programs"). Plaintiff characterizes the proposals as *performance* of the contract, not offers to make a contract. Thus, whether plaintiff's insurance proposals constituted performance of an already-existing contract, or simply offers to form a contract, turns on the existence of an exclusive broker contract between the parties.

In support of her assertion that there was an oral exclusive broker contract, plaintiff proffers her deposition testimony as well as other supporting evidence. Plaintiff testified that CAA reassured her that she and MCG were the exclusive brokers for CAA. (Gumenick Dep., 176:25-177:10.) Plaintiff also points to Walter's handwritten notes from October 9, 2006 stating that "[Gumenick] wants a copy of the k [contract] . . . ." and a

10

transcript of a voicemail from Gumenick to Walter referencing a confirming writing. (Ex. 101 to Bannon Dep.; Ex. 102 to Isom Dep. ("I wanted to know if we could put together some type of one-pager that says that anyone that I bring to the table on your behalf basically is tied to me when it comes to CAA.").) Moreover, plaintiff points to an April 26, 2007 email from co-defendant Isom to Gumenick (on which Walter was copied) discussing Isom's work and stating that Isom had no intention to leave Gumenick out of this option. (Ex. 116 to Isom's Dep.). Plaintiff asserts that this e-mail supports her assertion that all parties understood there was an exclusive oral agreement between Gumenick and CAA. Furthermore, plaintiff presents evidence that such oral agreements are "customary" in the insurance industry, as demonstrated by Gumenick, Isom, and CAA's involvement in similar oral agreements. (Gumenick Dep. 37:10-18 (stating that she has oral contracts with two current clients for commission); Decl. of Ralph Eidem ("Eidem Decl."), filed Apr. 2, 2009, at ¶ 3 (describing an oral agreement between Commercial Associates Insurance, Inc. and Tom Bannon of CAA); Isom Dep. 176:14-177:7 (describing a marketing arrangement in which "there was nothing in writing").) As such, plaintiff has set forth evidence sufficient to raise a triable issue of fact regarding whether a valid oral contract was executed between the parties.

Defendant CAA argues that plaintiff's evidence is insufficient to raise a triable issue. The court disagrees. According to defendant, plaintiffs' reliance on Walter's handwritten note undercuts plaintiff's claim that the contract was *oral*. Defendant contends that by requesting a "copy of the

11

contract," plaintiff appears to have been requesting a copy of an already-existing written contract, which does not comport with plaintiffs' claim that the contract was *oral*. (Def.'s Reply Mem. of P. & A. in Supp. of Def.'s MSJ ("Reply"), filed Apr. 9, 2009, at 3.) However, drawing every reasonable inference from the evidence, Walter's handwritten notes referring to "the contract" can reasonably be interpreted as a request for a written copy of an *oral* contract. Furthermore, Walter's notes strongly undermine defendant's argument that no contract existed between plaintiffs and CAA; these notes were taken soon after the alleged agreement and the words "*the* contract" imply the existence of a contract at the time Walter took the notes.[2]

Therefore, plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to the existence of an oral contract.

### 2. Parties to the Alleged Contract

The parties dispute whether Gumenick was a party to the alleged oral contract between CAA and MCG, thus entitling her to recover damages in her individual capacity.

---

[2] Defendant's reliance on <u>Hanley v. March & McLennan-J.B. F. Davis & Son</u> is unavailing. In <u>Hanley</u>, the plaintiff insurance broker claimed he was due commissions for insurance placed by other brokers on behalf of the San Francisco Board of Education. 46 Cal. App. 2d 787, 789-90(1941). The plaintiff made no reference to an express oral or written contract between himself and the Board under which he was entitled to secure insurance for the Board; instead, the plaintiff argued that his relationship and dealings with the Board created a contract implied in fact. <u>Id.</u> at 794. Under those circumstances, the <u>Hanley</u> court found the insurance broker's proposals, standing alone, were mere offers. <u>Id.</u> Conversely, in this case, plaintiff presents evidence that there was an exclusive broker agreement, and as such, her proposals were not mere offers, but performance of the contract.

As this court has previously held, MCG is not entitled to receive commissions arising from the alleged exclusive broker agreement because MCG was not licensed with the California Department of Insurance, as required by California law. (UF ¶ 54; Cal. Ins. Code § 1631 ("[A] person shall not solicit, negotiate, or effect contracts of insurance . . . unless the person holds a valid license from the commissioner authorizing the person to act in that capacity.").) Gumenick, on the other hand, was licensed when the alleged contract was created. (UF ¶ 54.) Thus, whether plaintiff Gumenick can recover commissions under the alleged contract depends on whether she acted solely in her official capacity.

Plaintiff Gumenick presents evidence that CAA contracted with *both* Gumenick and MCG. While the evidence shows that Gumenick never expressly indicated that she was acting "as an individual," it does not show that she was acting *solely* "as an agent for MCG." At times, Gumenick referred to herself in her individual capacity in communications with CAA. For example, in an email to Rob Bartholomew of Risk Partners, an insurance carrier, regarding a possible "compensation arrangement," Gumenick implored Bartholomew to mention "that *Samantha* already negotiated a great deal for CAA...." (Ex. 13 to Gumenick Dep. (Emphasis added).) Notably, Gumenick did not ask that MCG's efforts be recognized, only her own. Plaintiff Gumenick also submits evidence that Walter, acting on behalf of CAA, sent emails to Gumenick's professional *and* personal email addresses. (See Ex. 13 to Gumenick's Dep. (email from Walter to "sgumenick@mcgrp.com" and "sgumenick@aol.com"). Although

13

Gumenick, at times, signed her name above the company name, she does not indicate that she was acting as an "agent." (Compare Ex. 6 to Gumenick Dep. (email from Isom to Gumenick signed: "Lisa Isom, NSPS Agent").) Furthermore, considering the content of the alleged agreement, it appears that Gumenick's rights and duties under the agreement would be the same whether acting as an officer of MCG or as an individual. As such, plaintiff has set forth evidence sufficient to raise a triable issue of fact regarding whether CAA entered into a contract with Gumenick.

Defendant relies on Campbell v. Allstate Ins. Cos., which held that "[u]nder California law, if an agent acts in the name of his principal, *and the agency is fully disclosed*, only the principal, not the agent, can be liable for the acts of the agent." No. CV-95-1171-WDK, 1995 WL 376926, at *1 (C.D. Cal. 1995) (emphasis added). However, defendant fails to present evidence that establishes Gumenick's agency relationship was "fully disclosed." Rather, defendant contends that Gumenick "never indicated that she was acting on her personal behalf." (MSJ at 19). Defendant's contention rests on several pieces of evidence, including testimony from Gumenick admitting that she is the president of MCG and that her clients are in fact clients of MCG. (Gumenick Dep. 21:23-29:2.).[3] Defendants also rely on several communications between Gumenick and CAA containing

---

[3]     When asked during deposition whether her clients were "actually clients of MCG," Gumenick responded "[t]hat's correct." (Id. 22:11-17.) Gumenick also responded "Yes" to the following two questions: "Do you always represent yourself as the president of MCG when you're dealing with your clients?" and "When you were dealing with CAA, California Apartment Association, did you represent yourself as president of [MCG]?" (Id. 26:3-10.)

references to MCG.  E.g., Ex. B to Walter Decl. (email from Gumenick to Walter of CAA showing Gumenick's email address as "sgumenick@mcgrp.com"); Ex. 8 to Gumenick Dep. (presentation to CAA on which the "MCGroup" logo appears on the top left corner of every page); Ex. 11 to Gumenick Dep. (letter from Gumenick to Walter that shows "MCGroup, LLC" appearing below Gumenick's signature).  However, while Gumenick indicated in her deposition that she was acting as president of MCG, there is no evidence that she was not simultaneously acting in her individual capacity.

Therefore, plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to the existence of a contract between CAA and Gumenick.

### 3.    Contractual Terms

Defendant further contends that, even assuming the existence of an oral contract between CAA and Gumenick, the contract cannot be legally binding because the terms of any such agreement, including compensation, were indefinite and undetermined.

In ascertaining the intent of the parties to a contract, "courts increasingly demonstrate[] their willingness to examine the entire relationship of the parties." Foley v. Interactive Data Corp., 47 Cal. 3d 654, 679 (1988).  This includes "gap filling" with commercially acceptable terms. Id. at 680.  "In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including . . . actions or communications by the employer reflecting assurances of continued

/////

15

employment, and the practices of the industry in which the employee is engaged." Id. (Internal citations omitted).

Plaintiff Gumenick presents evidence that it is customary practice in the insurance industry for insurers to pay the commissions under the broker contracts. (See Gumenick Dep., at 212:6-7 (testifying that the commission received under the alleged contract would "depend on the program" implemented).) Thus, the nature of the alleged contract is such that the exact terms of the compensation would not be known until the placement of the policies by the insured following plaintiff's performance in creating the program and placing the insurance. (See Mem. & Order [Doc. #52], filed Sept. 26, 2008, at 11:18-20) ("[P]laintiffs' compensation would be measured by future commissions derived from the value of the workers compensation programs.").)[4] As such, the court cannot conclude that the alleged contract is void for lack of definiteness.

Therefore, for the reasons set forth above, defendant's motion for summary judgment as to plaintiff Gumenick's claim for breach of contract is DENIED.

**B. Fraud**

Defendant moves for summary judgment on plaintiffs Gumenick and MCG's fraud claim against defendant CAA arising out of misrepresentations made in connection with the alleged contract.

---

[4]    Further supporting this contention regarding industry practice is a May 15, 2007 letter from Bannon to Isom giving the latter "full and exclusive authority to develop a workers' compensation program on behalf of the California Apartment Association with the authorized insurance carrier." (Ex. 104 to Bannon Dep.)  Notably, this letter does not specify compensation terms.

Specifically, defendant contends that Gumenick and MCG's fraud claim does not arise from duties independent of the alleged contract and is thus barred by the economic loss rule.

The economic loss "rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.'" <u>Robinson Helicopter Co., Inc. v. Dana Corp.</u>, 34 Cal. 4th 979, 988 (2004) (quoting <u>Redarowicz v. Ohlendorf</u>, 441 N.E.2d 324, 327 (Ill. 1982)). It precludes recovery for "purely economic loss due to disappointed expectations," unless the plaintiff "can demonstrate harm above and beyond a broken contractual promise." <u>Id.</u> This "rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.'" <u>Robinson</u>, 24 Cal. 4th at 988 (quoting <u>Redarowicz v. Ohlendorf</u>, 441 N.E.2d 324, 327 (Ill. 1982)). In other words, "'conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law.'" <u>Id.</u> at 989 (quoting <u>Erlich v. Menezes</u>, 21 Cal. 4th 543, 551 (1999)).

In <u>Robinson</u>, the California Supreme Court articulated the standard for determining whether a fraud claim survives the existence of a contract governing the same subject matter. The plaintiff, a helicopter manufacturer, brought claims against a helicopter parts supplier for breach of contract and fraud. 24 Cal. 4th at 984-85. When the defendant changed its process for manufacturing a particular part that it sold to plaintiffs, it misrepresented that the parts still complied with plaintiff's written specifications and issued certificates to that effect. <u>Id.</u> at 986-87. The defendant's misrepresentations "exposed [the

17

plaintiff] to liability for personal damages if a helicopter crashed and to disciplinary action by the FAA." Id. at 991. As such, the California Supreme Court held that the economic loss rule did not bar the plaintiff's fraud and intentional misrepresentation claims "*because* they were independent of [defendant's] breach of contract." Id. at 991 (emphasis added). However, it clarified that "[o]ur holding today is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss.*" Id. at 993 (emphasis added).

In this case, the alleged misrepresentations that form the bases of plaintiffs' fraud claim are: (1) CAA's initial promise associated with the alleged oral contract that plaintiffs would serve as CAA's exclusive broker; and (2) CAA's subsequent assurances as to the existence of this exclusive broker relationship. Unlike the misrepresentations in Robinson, which related to a separate transaction entered pursuant to the contract, the misrepresentations at the center of plaintiffs' claim is the contract itself. The assurances allegedly made by defendant related to its duty under the contract, i.e., that CAA would perform its end of the bargain by working exclusively with and through plaintiffs in procuring the insurance program. Moreover, the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract (i.e., loss of commissions). To allow a fraud claim under these facts would "open the door to tort claims in virtually every case in which a party promised to make payments under a contract but failed to do

so." <u>Intelligraphics, Inc. v. Marvell Semiconductor, Inc.</u>, No. C07-02499 JCS, 2009 WL 330259, at *17 (N.D. Cal. 2009).

Therefore, because the economic loss rule precludes plaintiffs' recovery, defendant's motion for summary judgment as to plaintiffs Gumenick and MCG's fraud claim is GRANTED.[5]

## C. Conspiracy

Defendant moves for summary judgment on plaintiff's conspiracy claim on two grounds: (1) that plaintiffs have not proffered evidence to show defendants formed and operated a conspiracy with co-defendants and (2) even assuming the existence of a conspiracy, the economic loss rule precludes this claim for the same reasons discussed in connection with plaintiffs' fraud claim.

To assert a claim for civil conspiracy, a plaintiff must show: "(1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy." <u>People v. Beaumont Inv., Ltd.</u>, 111 Cal. App. 4th 102, 137 (6th Dist. 2003) (citing <u>Applied Equipment Corp. v. Litton Saudi Arabia Ltd.</u>, 7 Cal. 4th 503, 511 (1994)); <u>see also</u> <u>Frost v. Hanscome</u>, 198 Cal. 550, 557 (1926) ("In a conspiracy there must be the concert of action between two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful or fraudulent means.").

/////

---

[5] Because the court holds that the economic loss rule bars plaintiffs' fraud claim, the court does not reach the merits of defendants' other arguments with respect to this claim.

19

Plaintiffs' conspiracy claim is premised upon the allegations that CAA, Isom, and ARM conspired to defraud plaintiff throughout their dealings. Plaintiffs present evidence that CAA was aware of Isom's alleged misrepresentations to Gumenick. Specifically, plaintiffs point to an email from Isom to Gumenick, to which Walter was copied, assuring Gumenick that she would not be left out of discussions. (Ex. 116 to Isom Dep.) Plaintiff also presents evidence, as set forth above, that defendant CAA communicated directly with Isom during the period when plaintiffs believed they were acting as the exclusive brokers to CAA. (Ex. 101 to Bannon Dep.) Drawing all reasonable inferences from this email and the communications between CAA and Isom, as well as from the evidence that defendants eventually excluded plaintiffs from the insurance programs, plaintiffs have presented sufficient evidence to raise a triable issue of fact that Isom, ARM, and CAA had an agreement to defraud plaintiffs that they acted upon such agreement to plaintiffs' detriment.

Defendant CAA argues that the economic loss rule operates to bar plaintiffs' recovery on their conspiracy claim, as it did for their fraud claim. However, "[c]onspiracy is . . . a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." Applied Equipment Corp., 7 Cal. 4th at 510-11. With respect to plaintiffs' theory of conspiracy, the proper inquiry relates to both Isom and CAA's conduct, not simply CAA's conduct in connection with the contract. Because the alleged conspiracy to defraud did not begin until Isom began working with CAA *after* the

20

formation of the alleged contract, the alleged conspiracy to defraud was independent of the alleged contract. <u>See</u> <u>Robinson</u>, 24 Cal. 4th at 986-91 (holding that misrepresentations made after the formation of the contract that caused harm separate and apart from contract damages were not barred by the economic loss rule). Thus, the court cannot find that the economic loss rule precludes recovery for damages as a result of the alleged conspiracy.

Therefore, CAA's motion for summary judgment as to plaintiffs' claim of conspiracy is DENIED.

### D. Restitution[6]

Plaintiffs Gumenick and MCG cross-move for partial summary judgment against CAA on their restitution claim.

To assert a claim for restitution, a plaintiff must demonstrate that: (1) the defendant received a benefit (2) at the expense of the plaintiff, and (3) the retention of that benefit would be unjust. <u>Lectrodryer v. SeoulBank</u>, 77 Cal. App. 4th 723, 726 (2d. Dist. 2000). Because plaintiffs, as the moving parties, have the burden of proof at trial on their restitution claim, they must affirmatively demonstrate that no reasonable trier of

/////

---

[6] Plaintiffs' complaint alleges a claim for "detrimental reliance/unjust enrichment." (FAC at ¶ 68-75). Defendant CAA moved for summary judgment on this detrimental reliance claim, asserting that plaintiffs' reliance was unjustified. (MSJ at 20.) In response, plaintiffs do not address the detrimental reliance claim, instead arguing that their *restitution* claim does not require justifiable reliance. (Opp'n at 14-15.) The court interprets plaintiffs' response as a clarification that they are *not* seeking a claim for detrimental reliance, but only for restitution. Further, plaintiffs' failure to assert any argument in response to defendants' motion is interpreted as a non-opposition. As such, defendant's motion for summary judgment on plaintiffs' detrimental reliance claim, to the extent one was alleged, is GRANTED.

1  fact could find other than for the moving party.  See Celotex,
2  477 U.S. at 323-24.

3      Plaintiffs have failed to establish that no reasonable trier
4  of fact could find other than for them.  While plaintiffs present
5  evidence that CAA, ARM, and Isom worked together to the exclusion
6  of plaintiffs, (e.g., Ex. 203 to Isom's Dep. (email sent for the
7  purpose of ensuring that the "East Coast" did not have access to
8  certain information)), defendant CAA presents evidence that there
9  was never an exclusive oral contract under which plaintiffs would
10 serve as CAA's exclusive brokers, nor any assurances to that
11 effect.  (See Walter Decl. at ¶ 20; Bannon Decl. at ¶¶ 2-3.)
12 Further, defendants proffer evidence that plaintiff Gumenick was
13 aware that defendant CAA was communicating with other brokers,
14 and thus did not reasonably rely on any assurances regarding an
15 exclusive agreement.  This conflicting evidence presents a
16 genuine issue of material fact as to whether any benefit CAA may
17 have received in connection with the insurance plans was
18 "unjust."

19     Therefore, plaintiffs' motion for summary judgment on their
20 claim for restitution is DENIED.[7]

21 /////

22 /////

23

24     [7]   The court notes that defendant peripherally raised
   issues with respect to limitations on damages in its motion for
25 summary judgment.  However, these issues were briefed without
   clarity or specificity as to the limitations sought.  Moreover,
26 defendant first raised an argument with respect to limitations on
   MCG's damages in its reply.  As such, the court does not address
27 these issues herein.  However, nothing in this order precludes
   defendant from raising these issues in a fully briefed motion in
28 limine prior to trial.

                                   22

**CONCLUSION**

Based on the foregoing analysis, the court makes the following orders:

A.    Plaintiffs' partial motion for summary judgment is DENIED.

B.    Defendant CAA's motion for summary judgment is:

     1.    DENIED as to plaintiffs' breach of contract claim;

     2.    GRANTED as to plaintiffs' fraud claim;

     3.    GRANTED as to plaintiffs' detrimental reliance claim;

     4.    DENIED as to plaintiffs' conspiracy claim.

IT IS SO ORDERED.

DATED: May 27, 2009.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE